Page 24-1598 and 24-1676, Wayside Church et al. v. Van Buren County, MI et al. Oral argument, 15 minutes for appellants, 15 minutes to be shared by the appellees. Mr. Kaye for the appellants. Good morning, Your Honors, and may it please the Court, Christopher Kaye on behalf of the appellant objectors, and I have reserved five minutes for rebuttal. Very well. At the outset, I'd like to make three key points that I hope will be helpful for framing the objectors' arguments for the Court. First of all, Rule 23 forbids reverse auctions as happened here. Because Rule 23G2 says that when there are motions, competing motions, for class leadership, the Court must decide. Counsel cannot allow themselves to be selected by the defendants and thereby appoint themselves. Second of all, this case is worse than an ordinary reverse auction. Because here, 42 out of the 43 counties could not be sued by the Wayside plaintiffs without their permission. What do you mean by that exactly? What happened here was... You can always round up somebody who got hurt, or you could potentially round up somebody who got hurt and just add them as a plaintiff and bring them in whether they want to be there or not, the county. Well, certainly, Your Honor, you can round up plaintiffs. But what happened here was that the district court had barred Wayside from naming the counties as party defendants. Wayside pled the case as a defendant class. Right. Well, this is after Fox, presumably.  Right. And so Fox says, look, you know, the plaintiff doesn't have standing. The plaintiff from one county doesn't have standing to sue the others. I mean, Judge Maloney is not saying you're categorically barred forever from trying to bring in other counties, isn't he? I mean, he's just saying if you're going to bring them in, you have to get a plaintiff who's from that county. Isn't that the case? I don't think that's actually what he said. Because this decision to deny Wayside leave to amend its complaint to transition from a defendant class to naming the counties as party defendants, as the Granger case had done, that motion took place before Fox was decided by this court. So the issue there was Judge Maloney said it's too late in the case for the count or for the Wayside plaintiffs to name the counties as party defendants. And what's critical. Also say that it is, quote, unnecessary because you already have the defendant class allegation. I'm looking at Page I.D. 1960. He did say that, Your Honor. But I think that at the end of the day, I have two points in response to that. First of all, at the end of the day, I don't think that a defendant class would have worked. And amongst other things, we know that Van Buren County said it did not want to serve as class representative for a defendant class. Other counties said we do not want to be represented by another county in a defendant class. And ultimately, not only did Wayside Church seek to amend its complaint to transition to named party defendants, but that's how the settlement was structured. And I think ultimately, to get back to Fox, I think ultimately this sort of bilateral class action with a defendant class would have been untenable. But at the time, at the end of the day, the judge said it was unnecessary at that point because you did have the defendant class allegations. Whether it would have worked later on, whether they could have been added later on, et cetera, et cetera. But at that time, and at the time you allege about this competition and the reverse auction, the judge is just saying, oh, it's, quote, unnecessary. But I think the other point there is that even if the judge did say that, and even if the judge was ultimately open to amending once the settlement came into place, at the time, Granger was much more strongly positioned. Because Granger was going to need to add in plaintiffs for each county under Fox. I mean, we're going to have a pretty deferential standard of review for this sort of ground level granular thing. I mean, I'm just saying, and I'm not cutting off any answer here, but I think you might just want to think about what you want to argue here. I mean, the idea that we're going to, on a granular level, revisit Judge Maloney's judgment about the strength of Granger versus the strength of this case. I mean, I'm not sure if that is the strongest card you might have. I certainly appreciate that, Your Honor. But I do want to return to the structure of Rule 23, and Rule 23G2 in particular, which does say that when there are competing motions, and there were competing motions for class leadership throughout the time of these negotiations. They were here a lot earlier. I was here before any of them, frankly. Mr. Sheck was here. But, I mean, these folks came to this in 2019, and Granger was some time after that. I think I'll sort of talk there briefly for a moment. I think Wayside was filed in 2014. Granger was filed in 2019. But as we talk about in the papers, there were, as you know from personal involvement, there were several detours. There were long periods during which Wayside effectively languished. And the class leadership contest really begins in 2019. But by 2021, when the negotiations begin, at that point, and this is when the district court has barred the naming of 42 out of the 43 defendants, but at that point, there were pending leadership motions. And Rule 23G2 says that the court must decide that. And for the defendants to be able to choose their opponent, and for that opponent to allow themselves to be so chosen, is not only inconsistent with Rule 23, it's inconsistent, not only violative of Rule 23, but it's inconsistent with the traditional notions of an adversarial system that underlie Rule 23. As this court has talked about in the Shane Vukovic- Back to sort of the reverse auction theme? Yes, yes. Yeah, I just, I mean, in these class actions, it's common to have multiple cases with multiple leadership groups and kind of competing to see who's going to settle first. And maybe this goes to Judge Kessler's point about the 42 counties or 43 counties, but this happens a lot. I mean, there's a lot of times plaintiffs' lawyers are fighting over which case can be the lead because it's very lucrative to have the lead case. And this feels to me a little bit like plaintiffs' lawyers fighting over money. And I know there's more to it than that, but the district judge has to pick one case to be the lead. Every case has got some flattering features and some unflattering features, and we leave it to the district court to sort of pick the one to go forward with. And I don't, I appreciate all the points you're making. Had your case, had Granger been the case, let's say, that was deemed the lead case, the other side would have had challenges why that wasn't the better case. And there's a lot of dynamics going on in this case, but my general instinct is that this is something that happens a lot in this setting. And we do leave it to the district court to, in the first instance, police it. I think, I want to go back to something you said a moment ago, which is that the district court made its decision about which case would proceed. And I actually don't think that's what happened here. I think that what happened is that the defendants chose which case would proceed by settling. We can get that argument. I'm just telling you. Can I? I'm sorry. No, it's just kind of, you might want to talk about some other stuff too. And maybe along those lines, I'm curious, is your argument against approving the settlement more these like process-based things, or is there also an argument, I think I understood from your briefs, just at the end of the day that the result is not a fair settlement? I think the result was unfair for two reasons. The first fundamental reason is tied up with process. Okay. Because Rule 23 talks about, under this circuit's traditional criteria, the first criteria was the UAW factors, was the settlement collusive. And under Rule 23E2, the first two criteria are, was the negotiation arm's length. So if we disagree with you, hypothetically, about the process-based concerns you have, whether coming to it and who is named as class counsel, and that factor, for example, within, you know, was this arm's length and all things, if we disagree with you on the process-based arguments that you make, do you, should we then, would we then just approve the, say that the district court didn't abuse its discretion in approving the settlement, or do you have other bases that are not process-based? No, Your Honor, there are other bases. And I would break those down into two. One is, as we talk about in the papers, and I won't belabor them all right now, but happy to answer any questions, many of the issues involving the administration of the settlement, including the list, the quote-unquote listing of plaintiffs, class representatives who ended up being deceased, not just for some time, but for the entire period of time, the manner in which outreach was done to class putative, absent putative class members. No problem with talking to people, but there were misrepresentations there that we've talked about. The idea that maybe the homeowners should have gotten a lot more money out of this. Well, they should have. That was going to be my second point. Well, this should maybe be your first point. So why don't we go to this? That at least resonated with me a little bit, that these were, you know, depending on how you look at it, we have the Hall case. These were, you know, reasonably solid claims that were settled for 80 cents on the dollar or 64 cents on the dollar, or maybe even less, depending on how you calculate interest. I think that there's two, a couple points of comparison. One of the points of comparison that you raised is what this court has said the damages are, right, which is surplus proceeds plus interest. When did we say that? That is... Hall or some different case? I think that's Freed, and I think that that was restated in Bowles. And then the district court in Freed also afforded for attorney's fees. That statute's been there all along. And the other statute that is there is the sort of the bare minimum state statute that the counties helped to get enacted, and that bare minimum provides for 95 cents. Was that in place or at least triggered and effective at the time that the settlement was reached between the parties or even approved? Like, is that appropriate for us to be thinking about? I think it is appropriate to think about, both because it did come into effect, and I think that it was a reasonable expectation that it would come into effect. It was triggered by needing a decision by the Michigan Supreme Court. Correct. That had happened by the time of the settlement. I thought it was the final approval was in June of 2024, and when was Schaefer? Schaefer was decided in July. So that wasn't information that the district court judge had. It wasn't information that the district court judge had, although we've always maintained, and we were involved in Schaefer as well, we've always maintained that it was quite reasonable to expect that Schaefer was going to come down the way that it did, because it would have been very unusual to say that Raffaelli did not apply retroactively. But the other point that I would make about Public Act 256 is that whether or not it was available to those class members, it reflected a bare minimum recovery that was engineered and facilitated by the counties. And the wayside class action got a worse result than that point of comparison.  Let's leave it there, because we're in the red, and you're going to have your substantial rebuttal time. And let's hear from Mr. Fink. Thank you. Thank you, Your Honor. May it please the Court, we're back again.  Yeah, we see each other a lot, Mr. Fink. In Kalamazoo, and here, and you name it. David Fink, appearing on behalf of plaintiffs, and with me at counsel table is my senior partner, Nate Fink, who is also my son. Judge Ketledge has been with this case longer than I have. Jim Schach filed this case in 2014. It was up and down, as the Court knows. It was Judge Ketledge who put the label theft on, which we've repeated many times, on this process. Well, when you take by coercion property worth $200,000 for a debt of $16,000, and you keep the difference, you know, in some legal precincts, you're going to get in big trouble for that. That is correct. And that's why Wayside Church has been committed to this from the beginning and stayed with us throughout this process. After 10 years, we think we reached a very solid settlement. Now, it's absolutely true that we would have liked more. We didn't get everything that we wanted, but you don't usually get everything you want in a settlement. That's true, but this is a unique case. I mean, you're holding a lot of cards, I would say, in terms of your legal arguments, right? You had the benefit of the whole decision by the time you settled, which was close to saying your clients were due 100% compensation for the value between the taxes and what the home was priced at. Our problem at that point was that retroactivity hadn't been determined. That's not true. That's not true. I mean, that might be true for Raffaele, but Raffaele is just a backup. I mean, that goes to the Michigan takings clause. Hall, as a matter of federal constitutional law, gave people whose properties were taken like this a constitutional entitlement to 100 cents on the dollar, not just on proceeds, by the way, from a foreclosure sale, but from the value. Like in that case, the taking entity just flips it to the city of Southfield, which then flips it to another for-profit entity. There was no surplus, but they had an entitlement. So there's no retroactivity. The taking clause has been there since 1868. It's there. It was already in effect. That's the clause that we were enforcing there. And so it's just not an issue as a federal claim. The other issue that you deal with there, though, is class certification or treating it as a class because you have the problem that if you're going with fair market value, which you have to do in the hypothetical that the court identified. I would suggest it's like distressed fair market value, but go ahead. You have an entitlement to a foreclosure sale. It's like what you'd get at a competently run foreclosure sale. That's legitimate. The distinction is with these surplus cases, you have a defined amount. It's very clear. You know exactly what it is, and so you don't end up with all these individualized issues. Right. And that's why this is easy to do in a class, the group you've chosen. I agree. Right. And in that regard, when we look at it in terms of the class, when we look at it in terms of the settlement, the option to get 95 cents on the dollar, I just want to be clear, when we look at this total package, we agreed not only to 80%, but we accepted an attorney fee of 20% so that the net result was 64 cents to the plaintiff. Now, that may not sound like full recovery, but if they get 95 cents, we've seen the attorney fees. It's in the record. The attorney fee agreements for the objectors were either a third or a half. At a third, they get 63 cents. What about Section 1988? It absolutely would be possible. We argued, believe me, what I'm hearing from there is what they were hearing from our side as we were negotiating. And I want to get to that real quickly, which was if this was collusion, and if it isn't collusion, there's really nothing here. Can you stick with them, Matt? In other words, when you settle a case, you have to weigh litigation risk, right? My chances of winning, chances of losing, and so that makes sense. I just don't know, what were the risks that your clients faced? So one was the classification question? We had classification, but with respect to the state claims, we had the risk of retroactivity. We had a risk on statute of limitations, which was being interpreted in different ways. It's not an accident that this case hung around for so long. We were up and down the courts. We were fighting it every way that we could. And I would offer this. That's true. If you had a lot of wind at your back after Hall, I would say. You had a lot of wind at your back after Hall. Yes, we did. But I have to say this. If you look at this, if you really want to look objectively at whether Judge Maloney abused his discretion in approving this, whether Judge Maloney addressed this, the main point I would highlight is the claims rate. Because nothing tells you whether a settlement is acceptable like the acceptance by the parties. And in this case, we have an extraordinary claims rate. I literally have not seen it in any other class action. On the basis of properties, the properties affected, the claims rate is over 50%. On the basis of the available surplus that didn't opt out, on that basis, the claims rate is over 70%. I get that. I kind of bristle a bit at the reference to, and I'm not giving you a hard time personally, but to the available surplus as if this is like some fixed sum that's available to remedy this terrible harm that was done to these people. They took the money, and if they have to pay more, hypothetically, than the nominal value that they took 10 years ago, 8 years ago, 6 years ago, so be it, if that's what the law requires. So it's not just a percentage of the amount they took. Just to follow up on Judge Radler's question about the math, I look at Wayside. Wayside was here in 2017. They had a debt of $16,750. Van Buren County forecloses. In August of 2014, they sell the property for $206,000, do not refund a dime, to Wayside Church, a church on the south side of Chicago, which had a summer camp for the young people there to be able to go to western Michigan and spend some time there in the summer. That gets taken. Surplus $189,250. They don't get a dime. By the time Hall comes down, I'm not aware of any time bar. They're their class representative, so presumably, to some extent, they're representative. I'm not aware of any time bar that Wayside Church faced. I think Mr. Sheck was probably one of the first people ever to bring one of these claims. As a matter of fact, I think he filed the suit in 2014, like right after he saw what happened at the foreclosure auction. So there's no time bar here. Hall, you have a constitutional entitlement as a matter of circuit precedent. Supreme Court agrees 9-0 five months later. But in 1222, Hall is there. You have a constitutional entitlement. 1988 is there. I've seen your firm litigate. You guys are vigorous, very competent lawyers. 1988 is there. It's not that hard to figure out that when they violated Wayside's constitutional rights, you're going to be able to get fees. And prejudgment interest, I mean, that's not a novel concept either. Now, if, I mean, Wayside itself, I mean, you could move for summary judgment tomorrow, absent sort of the setting we're now in. Wayside itself, you could move for summary judgment. And with the entitlement to prejudgment, I mean, they took it 11 years ago, 190 grand. The time value of money is really something that starts to matter here. If you got a 5% prejudgment interest, the amount that Wayside would recover, $317,000 right now. What they get under this settlement, Mr. Fink, is $121,120, as I understand it. Less than 40 cents on the dollar for a bulletproof constitutional claim where they don't have to pay. The counties who did this would pay the fees. I agree. I mean, your fee is, I've seen these cases. The fee number itself is not, it's not bad. But the county itself would pay. And so, I mean, why is it fair if we get to rule, you know, rule 23E, if I recall. Why is this fair? Why is it fair to Wayside Church? Why is it fair to other parties? I mean, you have individuals here who lost their life savings. It was embodied in the equity in their home. It's gone. Why is this fair to get, you know, 38 cents on the dollar on a claim where you have this constitutional entitlement? Your Honor, let me respond. I don't want to burn Mr. Nelson's time, but let me just say, I feel like I'm in an echo chamber and hearing things we've been saying for years. Of course, we argued as aggressively as we could to pursue this. But at the time that we were negotiating this, we saw risks. We saw an opportunity. And we saw a way to settle the case. Judge Maloney looked at the entire record, was involved from the beginning, and knew all of the cases because Granger was in front of him also. He knew all the facts. He knew what was going on. He knew what the parties were doing. And I believe he had some empathy for the class, frankly. Sure, he did. I can't offer a bright line. Did I want more? Yes. Did we ask for more? Yes. And would our attorney fee have been greater if we had gotten more?  I'm not worried about your fee. But at some point, when you see somebody giving away this much, 60-plus cents on the dollar for a claim where, as a matter of law, they have 100% constitutional entitlement two months before the settlement is signed. At some point, we've got to go through like the platitudes and the generalities about risk. And I'm just waiting to hit bedrock where it's like, okay, I can see why it makes sense for Wayside to walk away from almost 200 grand that they could have gotten in their individual case by a motion for summary judgment like a 2L could win that motion. And, like, where's the bedrock here? I wonder. I wonder if there are a lot of claims in the class that have problems. And healthy claims like Wayside, I wonder if they're subsidizing claims that have problems. Because the math just doesn't add up. Your Honor, I am going to defer to counsel. Okay. Yeah, you guys can hand off as you will. I can only say that in all of my years of practice, we always won 100%. I'm sure you do. There's risks. Tyler hadn't come down yet. There were plenty of things that hadn't. It was 9-0. I mean, five months after Hall, so. I just have one question about attorney's fees, which I think you'd be better equipped to answer. So I think you did take a little discount on the fees. Had this played out, let's say you went to judgment, you won 100%. You would seek fees under 1988, but there's a lodestar analysis the court does, and it's probably likely that the amount of fees you'd be awarded would not be the amount that you'd be awarded under your contract with your clients. I don't know if your contract is publicly disclosed, but it's a third, let's say. In other words, I could see 1980 not covering the full amount you're entitled to. So if you went to judgment, you could then. But if you've got 100 cents on the dollar with the hours and the time that we put in, and the judge did a lodestar analysis, I don't think our fee would have been lower. No, I think it would have been higher. I was trying to help you, but maybe I'm wrong. I thought you would be entitled to arguably more money. If you didn't settle, if you went to judgment. No, we would have been entitled to more money. Right. So the 100% that your clients were getting, some of that would have been paid to you in fees, I think. Yes. Because the 1988 award wouldn't have covered the amount you were entitled to under your contract with your clients. Probably some part of it. If we went to judgment and we got 100 cents on the dollar, I suspect our fee would have been greater. I mean, we certainly never thought. But that wasn't our focus. I'm trying to help. I think. I'm just not doing a very good job. I just thought if you got them 100%, some of that would still probably, the 1988 wouldn't cover your fees that you're entitled to, so maybe they'd only get 90%. Am I wrong? Because it's a class, the court would have had to make the final determination on what our fee would have been. The court would still have had to review the fee. We couldn't have taken something from the class without the court signing off on it. I think he would have signed off on it, but he would have had to sign off on it. We have a lot of questions. Sorry, just one more question. We'll make sure that. Don't worry. We're not, I mean, this is important. It's definitely important to us. I'm curious how in your calculus for doing this, you, and thinking about the reasonableness of a settlement value, that you think about delay. I mean, this case has been going on for, you know, like you said, since 2014, like, you know, over 10 years. It's gone, you know, to the Supreme Court. It's gone to the circuit multiple times. I mean, people are, I mean, quite literally, plaintiffs are dying, right? People, like, you know, how do we, if we're thinking about, well, maybe the claims are worth a lot more than 30 cents on the dollar or 64 cents on the dollar, how do we factor in, like, you know, the value of money in your pocket today versus, you know, having individuals having to litigate this and all the difficulties of individual litigation, especially, like, you know, the banks coming in and saying, well, we have a lien on stuff, too, or just, you know, just wanting it done. Is that something that we should be thinking about or not, or do we just kind of look at, you know, what is the value on the merits? Delay cuts two ways, and as you've noted, over time, the time value of money going backwards, you would, you want to settle earlier, and then you'd have the money in hand. But at the time you're sitting at the bargaining table, and the case is now seven years old, I think. I've got to go back and do the math. The case is seven years old. There's some pressure to get it done from the members of the class. They want to be done. They want certainty, and as you've noted, and it's tragic, but in this case, we've lost, I don't know what the number is now, seven or eight of our class representatives, some of whom were added quite late, and we've had seven or eight of them pass away, two of the original three, and so time matters. You're 100% correct, Your Honor. Time matters, and resolving something where there were so many different degrees of uncertainty, I would love to say that once Hall came down, I just went to my banker and I would take a loan against this case. It didn't work that way. There was still risk. There's always risk, and some of the risk created by opposing parties and things, but most of the risk, as the Court notes, time and the uncertainty in decisions that were coming down. There are no slam dunks in the practice of law. I wish there were. Well, I don't know. This case, it seemed pretty close to it by the time, you know, we got to December. Your Honor, one of the reasons this took 20 months is that for 20 months, these poor guys on the other side were hearing us say that across the table, and we were fighting as best we could throughout this. I understand. I know you were. Okay. And, again, to the extent that the Court is looking to objective factors, I just don't think there could be any more objective factor than the claims rate. The folks came forward and took it. But they're relying on the judgment of lawyers, and the Court has an independent obligation to determine whether it's fair, and that's what we're wrestling with. Thank you, Your Honor. Thank you, sir. We'll hear from Mr. Kaye. Oh, I'm sorry, sir. I'm looking at the wrong. I'm sorry, Mr. Nelson. That's what I get for trying to personalize. No offense taken, Your Honor. Matthew Nelson on behalf of the defendant counties. If I may, I'd like to sort of walk in reverse order through the last few sets of questions to get to that bedrock, Judge Kethledge, that you were talking about. So, Judge Blumkatz, you asked about should delay factor into this, and yes. In determining whether the district court abuses discretion here, the fact that the settlement provided a guaranteed payment with the expectation that it would be sooner than continuing to litigate is certainly a factor that was something that the district court should have considered and we think appropriately weighed in assessing risk. Judge Radler, you asked about attorney's fees, and you're certainly correct that the attorney's fee analysis here is a bit of a wash because it would be some sort of discount. The way, to my understanding, this traditionally works, and I've seen it in various cases, is where there's a contingency fee plus a statutory attorney fee award, the attorney's fees are added to the total amount and then the contingency fee is multiplied by that total, and thus usually the 1988 or the statutory attorney's fees do not fully cover the attorney's fees that are ultimately paid by the plaintiff to their counsel. I guess the question I want to ask about fees, the basic question before us today is fairness, and why is it fair that the plaintiffs have to pay the fees? 1988, which has been there forever, creates an entitlement for the victims of a constitutional harm not to have to pay their fees, that the person who committed the harm has to pay the fees. I mean, here the counties unlawfully took all this property from these people. That's a matter of federal constitutional law. That's just not even open to debate. That's common ground here. Why shouldn't it be a requirement of fairness that the counties would pay the 20% fee, which is a reasonable fee in this case? Why shouldn't they have to pay that as a requirement for this to be fair? So, Your Honor, I have two responses to that, one of which I'll take the sort of lesser point than the greater point, which I think gets back to the bedrock question you were asking earlier. So with regard to that, the first point is the negotiation of the fee is always, for the defendant in a class action, is always part of this discussion in terms of how much are the defendants actually going to pay. So whether you say that the defendants are paying it or you say that the plaintiffs are paying it, it's always part and parcel of the same thing. But the feature here is that the contingency fee aspect of this aligned the incentives of plaintiff's counsel with their class members, unlike in other cases where there's a fee of $12 million for the attorneys and only a 10% claims rate. I understand that. I mean, you know, in DRIMACS we had that. I wrote about that. This case is different than, say, like a Chrysler class action where you do have that dynamic and the defendant can say, look, I'm willing to pay X amount and you tell me how much goes to the class members and how much goes to the lawyers. This case is different in the fact that we have 1988. We don't have 1988 in a product liability class action. There's a separate entitlement, a separate duty that the defendants would pay the money. How come that's not reflected in this settlement? I mean, the counties did this in violation of the federal constitution. So, Your Honor, the other piece of this, and I think this gets down to that bedrock question you were asking, is the application of questions of the statute of limitations, tolling, and relation back. So we have a situation here and across these cases where there's a risk to the plaintiffs, not to Wayside Church, not to that individual plaintiff, but with regard to the plaintiffs generally in terms of when do their claims accrue and when are they treated as having filed their claims, such that when does that three-year statute of limitations run for 1983 purposes. Do you say plaintiffs generally, just to be precise? Are you speaking about the named plaintiffs or the class? I'm sorry, the putative class members. I should have been referring to putative class members, but your correction is wrong. That's okay. I just wanted to make sure. So the putative class members have varying risk, statute of limitations risk, based on the fact that they didn't, in fact, bring 1983 claims in 2013. Because Williamson County blocked them. It really did. Well, you couldn't. I mean, Wayside 2017, there's Exhibit A of that. They couldn't bring them. But across the board, but there is risk associated with how does the statute of limitations interact with this. And then, frankly, we're dealing with these in a whole variety of these opt-out cases where the issues with regard to the statute of limitations tie not just to, not just as Brother Counsel would suggest, as to what the statute of limitations is, whether it's three years for, I mean, I think there's consensus. It's three years for 1983 claims and six years for state statutory claims. So for many of these individuals, they were looking only at state statutory claims. But also, with regard to how does tolling work, what's the actual accrual date? The accrual date for federal claims seems to be the date of foreclosure. Under state law, it seems to be the date of the, it's arguably the date of the auction, although perhaps not. That issue is coming back up in front of the Michigan Supreme Court. So what you end up with is a group of, a putative class that has very significant risk with regard to statute of limitations. And you have additional risk based on other individualized offenses. None of the counties have just, it's never occurred to any of the counties just to pay these people what they took from them. They're going to just invoke every limitations defense. You know, Williamson County keeps these folks from being able to even sue in federal court. And the counties just pocket this and nobody considers paying these people, these residents of these counties, what the counties took from them. Never curse anybody. Your Honor, in 2021, so shortly after, I mean, within less than a year of the Raffaelli decision, we started negotiating a settlement that resulted in the settlement that's now in front of you. It's not personal to you, Mr. Nelson. But I'm saying the counties, so this court recently criticized a county for seemingly dragging its heels. I think that was the language that was used in Bowles. The counties here didn't. They came forward and they said, we want to resolve these cases. It's real easy. Just write a check. Do the right thing. But that's not the legal question. We're here for the legal question. And the legal question, I believe, is did the district court here abuse its discretion in assessing that the settlement here was fair and adequate? And, you know. Of course.  Yeah. Maybe some of the mentions of the county council was not as favorable. But you got pretty favorable footnote in the district court's decision here about how vigorously the counties, how good the county's attorneys are and how vigorously they will fight these claims and bring these defenses. And you've mentioned some of them, accrual date, statutes of limitations, other kind of equitable claims. I'm curious. I assume if this settlement is not approved, like hypothetically we don't approve it, then the counties would presumably oppose class certification even though they agreed with the settlement class. And what impact should we think about in terms of the risk that the class might not be settled, the class might not be certified, and therefore, you know, the risk to all the people in the class that then either they have to bring individual claims or maybe won't be able to get a claim at all at their time. Your Honor, I mean, we would have opposed class certification in the absence of the settlement context before. And whereas I hope we don't have to face that question, I would anticipate that we would oppose class certification again, especially in light of the availability of a state statutory mechanism for addressing these claims. Again, there, too, if I may go back to the issue of risk, that statutory mechanism doesn't provide relief, though, under the Schaefer decision for individuals from 2013 and 2014 like our class does. It potentially doesn't provide relief for those individuals in 2015. And those are the same people with the highest statute of limitations risk with regard to a 1983 claim. Does that state remedy expire at the end of this month? Do you have to, like, take action or something? There's a notice provision at the end of this month, a deadline for notice, and a motion deadline of October 1st later this year. Okay. So the risk that a class wouldn't get certified and then the people who, you know, lost their life savings and lost all this money, like, wouldn't be able to collect at all even as individuals is something that factors into the fairness evaluation. Yes, Your Honor. I think it was an even greater factor at the time that Judge Maloney was addressing this before the Schaefer decision came out, which is what I think the court has to apply, that has to look at this from the perspective of the parties and of the court at the time the settlement was reached. Do you have a question? There's something I wanted to ask, and I just am blanking on what it was. Oh, so I guess, I mean, what I'm hearing kind of between the lines is that there is a cross-subsidy going on here. I mean, that there are some, and I don't know whether this has been, you know, sorted out as to individual members of the class, but you look at Wayside. There's no time bar there. Like I said, they're entitled $317,000 as we sit here, and they're going to get $120,000 under the settlement. So there must, and you point out, and it's not a surprise, that some folks here are going to have time bar problems. Whether Williamson County would support tolling because they couldn't bring suit in federal court, I don't know. And I guess that's part of what you would say is the risk. But, I mean, just, I want, you look at the surface of this, and it's hard to add up. Maybe below the surface, you have some class members taking less than they could get on their own, and they're subsidizing people that might get zero. So, Your Honor, this issue was raised, you know, in a way, with regard to one of the individual objections. It might have been DePue, I think I'm remembering the right objector, and raised a specific question because the group with the least risk, statute of limitations risk, are those individuals whose properties were foreclosed in 2020. Now, they had an additional statutory risk because of the fact that PA-256 was enacted at the end of December. But this issue was raised. It was not raised on appeal, so the objectors have not advanced that argument. But we have an independent obligation to determine whether it's fair. So, I get it. But we have that obligation, and we are going to discharge that obligation here. I understand, Your Honor. And as I think I've indicated, you know, we've established what I think the risks are.  I believe I mentioned the res judicata.  I mean, you know, I had that in Hull. I mean, there were some folks who tried. I mean, it's just a tragedy that Williamson County was there during this time. But I had folks that tried other theories in state court. They lost. You got a final court judgment as to that matter. Nothing we can do. Folks that were one way or another barred. And there was that separate unpublished opinion. So, I know what you're talking about. So, well. So, Your Honors, if I may, I know I'm past my time. Okay, go ahead. The only, I did want to revisit the, it's a procedural issue, but it's come up several times. It's a 23G2 analysis. All right. Briefly. Very briefly. 23G2 only applies with regard to class counsel. There can be no class counsel until a class is certified. Here, at the time of the negotiations, there was no class certified. And therefore, 23G2 didn't apply until that point where we, frankly, based on this court's earlier decision in this case, it didn't apply until the final approval hearing. And at that point, I don't think there's any question that there was only one group of counsel who were vying to be class counsel in this case. The other counsel had taken the position that they would represent objectors and represent the opt-outs. Unless this court has any further questions. All right. Thank you. We appreciate the additional time. Thank you. We'll hear rebuttal. Thank you, Your Honor. I do want to return briefly to the Rule 23 issue and the reverse auction issue. And the reason is the court has been asking, what is the bedrock risk that Wayside's counsel faced in this case? And I think that the substantive risks, the class certification risks, and I'm happy to discuss those, I think that those were, at the end of the day, almost theoretical in this case. The real risk that they faced was that the defense team would no longer do business with them. And their position as class... Where do we get that from in the record? Where we get that from in the record is that, again, there were the pending Rule 23G2 motions for class leadership that was resolved by the attorneys who are now class counsel negotiating with the defendants and at the sufferance of the counties because 42 out of the 43, Wayside had been barred from naming them as defendants during the time of the negotiations. Again, their position was dependent on the counties. And that's, again, contrary to our adversarial system. An adversary should not be able to select who is going to represent their opponents. Why would Judge Maloney wave that through, do you think? I mean, Judge Maloney, I mean, extremely conscientious, engaged, wise district judge. Why, I mean, it's sort of, you know, why wouldn't he throw the flag if it's that bad? So there's no way to sugarcoat this, that we do think that it was an error, and that's why we're here. We do think that that was reversible error. And if I can articulate what I think is some of the defendants or the settling parties' argument, one of the things that they've suggested through the papers is that a reverse auction is sort of an extraordinary claim that requires extraordinary evidence of subjective malign intent. And I don't think that's true, because the situation here was structural. There was an inherent conflict, something this court has talked about in the Shane case, that there is the risk of an inherent, there's a risk of a conflict always in a class action. And that materialized here. And whether or not there was a smoking gun sort of communication, we don't know, because there was no discovery, or there was very, very nominal discovery about the class representative's property ownership. But whether or not there was a smoking gun email, it was a situation where who will rid me of this meddlesome priest collided with, or who will rid me of this meddlesome lawsuit collided with, well, that's a nice lawsuit you've got there, it would be a shame for something to happen to it. And I'm not saying they ever said that. They didn't need to say that, because it was inherent and structural, because class counsel's position depended on the defendant's. And I think that's the bedrock that explains why the settlement came in at the number that it did. As far as the risks that were identified, it's not just equitable tolling from Williamson County, there's class action tolling. And class action tolling, which the district court did recognize in Granger as applying because of someone's membership in the wayside putative class, and also under the even broader Cowles, Michigan Supreme Court case that we talk about in the papers, that applies because Michigan tolling law applies in a 1983 action, for the same reason that Michigan statute of limitations applies. And we do think, as we argue in the papers, the Minor v. Ogemaw case does say that that is a six-year statute of limitations. Before your time is up, can I just ask you a question? My understanding is you represent, as you said in your papers, a bunch of individuals who have opted out. Correct, correct. Have they been paid now? They have not. So their litigation is ongoing?  How long has it been ongoing? Well, they were putative class members, and they opted out, and those lawsuits would have been filed around the time of the opting out, so that would have been the summer of 2023. There are pending motions to dismiss. We just got noticed for hearing in May on some of those. They're facing, I assume, various different offenses in their cases. Correct. And, again ---- And those could then go on appeal, even if you prevail at the first stage that you're at. Those could, although, again, we believe that they have strong claims, just as we believe that Wayside had strong claims. And like I said, there's always going to be some sort of ---- you can always come up with an argument. There's always going to be some sort of theoretical risk. The question is whether it justifies this kind of discount. And I know that my time is up. I want to ask you about the limitations issue because I didn't quite follow your argument. Are you saying that the limitations defenses that the counties were asserting were overstated, that the periods were actually longer, so those weren't particularly valid defenses? Are you saying that the district court shouldn't have considered the risk to some class members that their claims were precluded, that that was a problem, or is it both? More the former. I think that any confidence that the counties have in that argument would be misplaced, both because there is the longer statute of limitations available, that we have that argument. I realize that the district court found it to be three years in Granger. Mr. Miller wants to tell you something. We'll let him tell you. But the district court also found that it was subject to tolling. But the one point that I did want to make, and I realize that my time is up, is to the issue of the numbers in the settlement. And to my mind, illustrating the difference between an arm's-length negotiation and what we did have here, just this past Friday, the court can take judicial notice and we can submit a 28-J, that just this past Friday, Charlevoix County, the Charlevoix County Circuit Court, where there is a certified class against Charlevoix County itself in Michigan, state court, the court issued a preliminary approval order of a settlement with which our firm was involved, $0.95 on the dollar in terms of surplus proceeds, plus interest with the attorney's fees paid by the county. And I think that that helps clarify and illustrate some of the issues that we've talked about. How many members are in that class? I think there's a couple of hundred in that class. What's the name of that case? That is Zettel v. Charlevoix County. All right. What's the status of the case in the Eastern District? So we have disclosed to the district court that there is a term sheet. And that is-  Excuse me? Fox case. The Fox case, correct. So we have disclosed that has been mediated. We have disclosed to the district court that there is a term sheet. We think that's a term sheet for terms that we are very happy with, and that we believe will compare very favorably with the numbers that we have discussed today. I guess I don't know how much I can really ask you about this Zettel case, but you heard Mr. Nelson explain that there were limitations issues that may have affected the numbers here. How did- I mean, can you say anything about how they affected that case? I don't think that they affected that case. Why? Because I don't think that those are ultimately impediments to class members' claims. Okay. I guess we'll leave that there. Well, those are all state- You're talking about the state litigation? Is that state litigation? That is state litigation. Okay. I see. It's state litigation, but it does have federal claims. Because 1983- It also has state claims. It has state and federal, yes. The 95 percent tracks the state. Yes. The 95 percent, it's state law takings claims. But, again, the 95 cents, I mean, that presents an obvious anchor point. Well, in the freewheeling manner of equity, we're going to have a brief sir rebuttal from Mr. Fink here.  Thank you, sir. Thank you. Thank you, Your Honor. Only to this last issue, because it hadn't been raised before, about the Charlevoix settlement and the reference to the Fox settlement. We're not going to go crazy on that, but, you know, it's an interesting data point. I would never expect this court to go crazy on anything. All right. Thank you, Mr. Fink. And expectations don't always work out. But all I wanted to say was that the very discussion about the Charlevoix settlement raised a critically important point, which is we reached our settlement between 2021 and 2022. In fact, working with the mediation, the Sixth Circuit mediation, we had reached our settlement terms before Hall came down. Yeah, but, you know, you could change the terms. Yeah, well, I'm just – but my point is – Settlement date is 1222. I understand. I understand. And this other one is much more recent, you're saying. Right, right. And I understand. And today, there is less uncertainty. That's all. There's less uncertainty today. And that's the only point that I wanted to make. There's a million other points I want to make, but that's the most important point. Okay. Well, that's very helpful. I appreciate it. All right. We thank all of you for your arguments and for your answers to our many questions. I can assure you that we're going to give this very careful consideration.